**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:                                                            :        Chapter 11
                                                                   :
Ambri Inc.,[1]                                                 :        Case No. 24-10952 (___)
                                                                   :
                      Debtor.                                 :        **Hr'g Date: TBD**
                                                                   :        **Obj. Deadline: TBD**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER
REJECTING CERTAIN UNEXPIRED EQUIPMENT LEASES
EFFECTIVE AS OF THE PETITION DATE PURSUANT TO
SECTIONS 105 AND 365(A) OF THE BANKRUPTCY CODE**

---

**\*\*ANY PARTY RECEIVING THIS MOTION SHOULD CAREFULLY REVIEW EXHIBIT 1 TO THE PROPOSED ORDER ATTACHED HERETO AS EXHIBIT A TO DETERMINE WHETHER IT IS A COUNTERPARTY TO A REJECTED LEASE THAT IS THE SUBJECT OF THE RELIEF REQUESTED IN THIS MOTION\*\***

---

The above-captioned debtor and debtor-in-possession (the "Debtor") hereby moves the Court (the "Motion") pursuant to sections 105, 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), for entry of an order substantially in the form attached hereto as Exhibit A (the "Proposed Order") rejecting leases with CSC Leasing Company ("CSC") of certain equipment set forth in Exhibit 1 to the Proposed Order.  In support of this Motion, the Debtor relies upon and incorporates by reference the *Declaration of Nora Murphy in Support of the Debtor's Chapter 11 Petition and First Day Pleadings* (the "Murphy First Day Declaration"), and the *Declaration of Robin Chiu in Support of the Debtor's Chapter 11 Petition*

---

[1] The Debtor's mailing address is 53 Brigham Street, Unit 8, Marlborough, MA 01752, and the last four digits of the Debtor's federal tax identification number are 0023.

*and First Day Pleadings* (the "Chiu First Day Declaration"), filed contemporaneously herewith. In further support of this Motion, the Debtor respectfully states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b), and pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtor confirms its consent to the entry of a final order or judgment by the Court with respect to this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are sections 105 and 365 of the Bankruptcy Code, and rules 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

### I.      General Background

4.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").  The Debtor is operating its business and managing its properties as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made, and no official committees have been appointed, in this Chapter 11 Case.

5.     The Debtor is a pre-revenue Liquid Metal™ battery technology company working to become a leading global provider of long-duration, grid-scale, energy storage that can solve the most critical issues facing today's electricity grid and enable wide-spread adoption of intermittent renewable energy as a 24-7 power source.  The company is developing batteries that are expected to be low-cost, highly reliable, extremely safe, degrade only minimally over their lifespan, and can shift fundamentally how power grids operate and source their power, thereby contributing to the goal of a cleaner energy future.  Because of its promise, the Debtor grew quickly between 2021 and 2023, raising approximately $150 million in equity financing in its Series E capital raise from blue-chip investors who chose to support and fund the Debtor's technology development and commercialization.  Capitalizing on its fundraising successes and technological advances, the Debtor decided to expand its business from research and development (with a goal of licensing) to also include high-volume manufacturing. To scale effectively and meet its new goals, the Debtor took on substantial costly obligations including an increased employee census, an expanded real estate footprint, and millions of dollars in construction costs to build out what was supposed to be the Debtor's first high-volume manufacturing pilot facility.

6.     Like many pre-revenue companies in the renewable energy space, that initial growth was interrupted by an incredibly challenging fundraising environment.  In the fall of 2023, despite strong interest from certain material investors, the Debtor was unable to complete a Series F financing round that would have enabled it to meet cell development milestones and complete manufacturing initiatives.  When the Series F financing fell through, the Debtor approached its existing investors to explore whether they would be willing to provide the Debtor with bridge funding through the issuance of secured notes.  At that time, the Debtor forecasted that it would need approximately $50 million in financing to fund operations through key development

milestones in its quest to achieve a "Prototype Design Concept" of an E3-Cell.  Despite its efforts, the Debtor was only able to secure commitments of approximately $42 million of its $50 million goal (due to one of its larger existing investors declining to participate in its pro rata portion of the financing), leaving it with a shortfall of nearly $8 million against its business plan.  Without additional funding or significant concessions from its vendors and contract counterparties, the Debtor concluded that the filing of this Chapter 11 Case and the pursuit of a value maximizing sale process was its only viable option.

7.      Additional factual background regarding the Debtor, including its business operations, its corporate and capital structure, and the events leading to the filing of this Chapter 11 Case, is set forth in detail in the Murphy First Day Declaration.

## II.      Overview of the Master Lease Agreement

8.      The Debtor is a party to a Master Lease Agreement, dated May 1, 2019, (the "Master Lease Agreement") with CSC.  Under the terms of the Master Lease Agreement, CSC agrees to lease to the Debtor, and the Debtor agrees to lease from CSC, certain equipment identified on separate schedules entered into from time to time between the Debtor and CSC.  Master Lease Agreement, §§ 1(a)-(b); 2.

9.      The Master Lease Agreement itself supplies background terms but does not result in the lease of any equipment by the Debtor.  Rather, such leases are created through the inclusion of equipment on separate schedules that are appended to the Master Lease Agreement over time.  Under the terms of the Master Lease Agreement, the Debtor can add or remove leased equipment.  Specifically, the Debtor and CSC from time to time may enter into schedules identifying additional equipment that the Debtor wishes to lease from CSC.  *Id*. § 2.  The Debtor may terminate each schedule by providing notice three (3) months prior to the expiration of the term of such schedule.

4

*Id*. § 3.  Section 2 of the Master Lease Agreement states that "[e]ach Schedule shall incorporate by reference all terms and conditions of this Master Lease except as provided herein together with such other terms or amendments, which may be specified in such Schedule, and together with this Master Lease, each Schedule *shall individually constitute the lease . . . for the Equipment specified in such Schedule*." (emphasis added).  *Id*. § 2.  Further, each of the schedules of leased equipment sought to be rejected through this Motion provides, "[i]n the event of a conflict between any term or condition of the Master Lease and any term of [sic] condition of this lease schedule shall control. The parties intend that this lease schedule shall constitute a separate and free-standing lease . . . of the equipment listed below."

10.     Under Section 3 of the Master Lease Agreement, the term of an equipment lease is determined on a per schedule basis.  The term of any given schedule of leased equipment begins on "the Commencement Date [of each Schedule] and shall continue for the number of full months set forth in each Schedule."  Master Lease Agreement, § 3.

11.     Under Section 4 of the Master Lease Agreement, the Debtor pays rent for the equipment leased under each schedule that consists of base rent and an amount equal to all taxes, if any, paid, payable, or required to be paid by CSC which are levied or based on the lease transaction, the base rent, the Master Lease Agreement, or the equipment or its use, lease, sale, operation, control, or value, including without limitation state and local taxes paid or payable by CSC.  *Id*. at § 4.

**III.    Events Leading to this Chapter 11 Case**

12.     As discussed in more detail in the Murphy First Day Declaration, in late 2023, following a challenging fundraising environment, the Debtor faced a shortfall in meeting its Series F financing round that led to a financial decline.  Despite attempts to right size its balance sheet

through bridge financing, operational savings, concessions with key counterparties, and negotiations with existing lenders, the Debtor failed to establish a sustainable long-term financial pathway and, as a result, commenced this Chapter 11 Case with the goal of pursuing a value maximizing sale process and reorienting its operational strategy for sustainable success for the business.

13.    Now the Debtor has identified certain schedules of leased equipment that the Debtor expects will generate limited or no revenue under its go-forward business plan.  The failure to reject these equipment leases would leave the Debtor exposed to claims that it owes millions of dollars in rent for equipment it expects will provide little or no benefit to the estate.  Thus, the Debtor has exercised its business judgement to reject immediately leases of certain equipment it does not believe it will use.[2]

## **RELIEF REQUESTED**

14.    By this Motion, pursuant to sections 105 and 365 of the Bankruptcy Code, the Debtor seeks entry of the Proposed Order rejecting certain leases of leased equipment set forth in Exhibit 1 attached to the Proposed Order.

---

[2] Substantially contemporaneously with the filing of this Motion, the Debtor filed the *Debtor's Motion for Entry of an Order, Pursuant to Sections 105(a), 165(a), and 554 of the Bankruptcy Code for Entry of an Order (I) Authorizing the Debtor to Reject a Certain Unexpired Lease of Nonresidential Real Property Effective as of the Petition Date; (II) Abandoning any Remaining Personal Property Located at the Leased Premises; and (III) Granting Certain Related Relief* (the "Milford Lease Rejection Motion") seeking to reject that certain lease (the "Lease") of nonresidential real property located at 196 E. Main Street, Milford, Massachusetts (the "Premises").  Pursuant to the Milford Lease Rejection Motion, the Debtor seeks to abandon its interests in Personal Property (as defined in the Milford Lease Rejection Motion) remaining at the Premises in connection with rejection of the Lease.  Certain of the Personal Property may be equipment leased by the Debtor from CSC that is the subject of the leases that the Debtor seeks to reject pursuant to this Motion.

**BASIS FOR RELIEF**

I.    **The Debtor Has Exercised its Sound Business Judgment to Reject the Specified Equipment Leases.**

15.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  A debtor's motion to assume or reject an unexpired lease or executory contract is subject to judicial review under the business judgment standard.  *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 120-21 (Bankr. D. Del. 2001) (*citing Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989)); *Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 847-48 (Bankr. W.D. Pa. 1987); *see also Nickels Midway Pier, LLC v. Wild Waves, LLC (In re Nickels Midway Pier, LLC)*, 341 B.R. 486, 493 (D.N.J. 2006) ("Although the Bankruptcy Code does not specify the standard to be applied in assessing the decision of a trustee or debtor in possession to assume or reject a contract, the Third Circuit has adopted the business judgment standard." (*citing Sharon Steel*, 872 F.2d at 39-40)).  This standard is satisfied when a debtor determines that assumption or rejection will benefit the estate.  *See Sharon Steel*, 872 F.2d at 39 (*citing Wheeling-Pittsburgh*, 72 B.R. at 846) (*quoting In re Stable Mews Assocs., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)).

16.    A court should approve the assumption or rejection of an unexpired lease or executory contract where a debtor's business judgment has been reasonably exercised. *See, e.g., In re III Enters., Inc. V*, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject an executory contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment—a standard which we have concluded many times is not difficult to meet."), *aff'd sub nom., Pueblo Chem., Inc. v. III Enters. Inc., V*, 169 B.R. 551 (E.D. Pa. 1994); *Wheeling-Pittsburgh*,

72 B.R. at 849 ("Ordinarily, courts accord the debtor's business judgment a great amount of deference since the decision to assume or reject an executory contract is an administrative not a judicial matter . . . . '[C]ourt approval under Section 365(a), if required, except in extraordinary situations, should be granted as a matter of course.'") (internal quotation marks and citation omitted) (*quoting Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981)).

17.    Only where the debtor's actions are a product of bad faith, whim, caprice, or a gross abuse of its managerial discretion should the business decision be disturbed.  *See Trans World Airlines*, 261 B.R. at 121 ("A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'" (citation omitted)); *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1047 (4th Cir. 1985) ("Transposed to the bankruptcy context, the rule as applied to a bankrupt's decision to reject an executory contract because of perceived business advantage requires that the decision be accepted by courts unless it is shown that the bankrupt's decision was one taken in bad faith or in gross abuse of the bankrupt's retained business discretion."); *III Enters.*, 163 B.R. at 469 ("We will not substitute our own business judgment for that of the Debtor, nor will we disturb its decision to reject the [contract] unless 'the decision is so unreasonable that it could not be based on sound business judgment, but only on bad faith or whim.'" (citation omitted)); *Wheeling-Pittsburgh*, 72 B.R. at 849 ("[T]he court should not interfere with or second guess the debtor's sound business judgment unless and until evidence is presented that establishes that the debtor's decision was one taken in bad faith or in gross abuse of its retained business discretion.").

18.    Ample business justification exists to merit judicial approval of the proposed rejection of the equipment leases.  The Debtor's shortfall in meeting its Series F Financing round

had a significant negative impact on the Debtor's financial affairs.  The rental payments associated with these unused pieces of equipment constitute an unnecessary drain on the Debtor's resources and provide little or no benefit to the Debtor's estate.  Additionally, as described in more detail in the Milford Lease Rejection Motion, the Debtor has vacated the Premises located in Milford, Massachusetts and seeks to abandon its interests in Personal Property (as defined in the Milford Lease Rejection Motion) remaining thereat, including certain equipment that is the subject of the leases the Debtor seeks to reject pursuant to this Motion.  The Premises and the pieces of equipment included on the schedules of leased equipment set forth in <u>Exhibit 1</u> to the Proposed Order are not necessary for the Debtor's go forward business plan.

19.    For these reasons, the Debtor has determined, in the exercise of its sound business judgment, that immediate rejection of the schedules of leased equipment set forth in <u>Exhibit 1</u> to the Proposed Order is necessary to reduce its obligations, manage its business, and pursue a value maximizing sale, while avoiding the potential incurrence of unnecessary post-petition claims for rent.  The Court should approve the Debtor's rejection of those leases in the exercise of its sound business judgment.

**II.    The Equipment Leases Are Distinct Contracts that May Be Rejected Under Section 365 of the Bankruptcy Code.**

**A.    A Single Lease Agreement Document May be Divisible for Purposes of Assumption and Rejection Under Section 365**

20.    Although the Master Lease Agreement supplies certain common background terms, the schedules of equipment leases are separate for purposes of assumption and rejection.

21.    In the context of section 365, this Court has held that the question of whether a specific contract or lease is an indivisible agreement or is severable is a question of state law.  *In re Buffets Holdings, Inc.*, 387 B.R. 115, 120 (Bankr. D. Del. 2008) ("The determination of whether a specific contract or lease is an indivisible agreement or is several agreements in one is a question

9

of state law."); *see also Pirinate Consulting Group, LLC v. C.R. Meyer & Sons Co. (In re Newpage Corp.)*, 2017 Bankr. LEXIS 413, at *13 (Bankr. D. Del. Feb. 13, 2017) ("State law governs the question whether an agreement is divisible or indivisible for the purposes of assumption and rejection under Bankruptcy Code § 365."); *DB Structured Prods. v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg. Holdings, Inc)*, 402 B.R. 87, 94 (Bankr. D. Del. 2009) (applying New York law to question of whether contract governed by New York law was severable).   Here, section 15(g) of the Master Lease Agreement provides that it shall be governed by Virginia law.

22.    Under Virginia law (which governs the Master Lease Agreement), courts are instructed to look at language of the documents to determine whether the "parties intended that the documents constitute a single transaction."  *Parr v. Alderwoods Grp., Inc.*, 268 Va. 461, 467, 604 S.E.2d 431, 434–35 (2004); *Countryside Orthopaedics, P.C. v. Peyton,* 261 Va. 142, 541 S.E.2d 279 (2001).  To determine the party's intent, Virginia courts consider a number of factors, including (1) the plain language of the contract, including cross-references between contracts; and (2) whether the absence of one of the agreements would frustrate the purpose of the others.  *Id.*

23.    This Court has found that the question of whether severability is feasible under the contract often turns on whether the pieces of a contract sought to be severed are "economically interrelated."  *See DB Structured Prod.*, 402 B.R. at 100 ("[C]ontracts are economically interdependent when the consideration underlying each contract supports the other contract, such that non-performance under one contract would constitute a failure of the consideration underlying the other contract."); *The Shaw Group, Inc. v. Bechtel Jacobs Co., LLC (In re The IT Group)*, 350 B.R. 166, 179 (Bankr. D. Del. 2006) (economic interdependence is "critical feature" of agreements where cross-default provisions are upheld; cross-default clause unenforceable where no evidence that contracts were "economically interdependent" or "intertwined"); *see also In re Sanshoe*

*Worldwide Corp.*, 139 B.R. 585, 596 (S.D.N.Y. 1992) (leases not construed as single instrument where leases were for separate spaces in same building, but did "not have the same subject matter or purpose, and one agreement [was] not the subsidiary of the other").  When the terms sought to be severed are not economically related, then a contract is "by its terms, nature and purpose . . . susceptible of division and apportionment" and will therefore be divisible. *DB Structured Prods.*, 402 B.R. at 94; *see also In re Balfour MacLaine Int'l*, 85 F.3d 68, 81 (2nd Cir. 1996) ("[A] contract is considered severable and divisible when by its terms, nature and purpose, it is susceptible of division and apportionment.") (citation omitted).

24.     For example, in *In re Cafeteria Operators, L.P.*, 299 B.R. 384 (Bankr. N.D. Tex. 2003), the court found that the debtors could assume a master lease with respect to some properties and reject it with respect to others.  The court found that the parties to the master lease intended the agreement to be divisible because the expiration dates of the various underlying leases covered by the master sublease agreement were different; and because the debtors-lessees of those expired properties were required to vacate the premises once the individual sublease on a property expired, even though the master lease remained in effect with respect to the other properties.  *Id.* at 390-91. The master lease also included a release provision whereby one of the underlying properties could be severed from the terms of the master sublease in the event that the debtors subleased the property to a third party.  *Id.* at 391.  Finally, as a practical matter, there was nothing to demonstrate that the individual facilities could not be operated separately and independently of each other.  *Id.* at 392.

25.     Similarly, in *In re FFP Operating Partners, LP*, 2004 WL 3007079, at *4-5 (Bankr. N.D. Tex. Aug. 12, 2004), the court found that a lease covering numerous properties was divisible where the lessor had the unilateral right to sell any of the properties, the single rent payment could

be apportioned among the properties pursuant to schedules, and the lease did not terminate if one property was damaged or condemned but remained in force for the remaining properties. The court further noted that the presence of a cross-default provision in each of the leases was "simply not dispositive" and merely "one fact that must be weighed with all of the other evidence when determining the parties' intent." *Id*. at *4.

**B.    The Equipment Leases are Divisible from the Master Lease Agreement**

26.    Here, the plain language of the Master Lease Agreement and each schedule of leased equipment indicate that the parties intended for each schedule of leased equipment to constitute a separate agreement.

27.    First, section 2 of the Master Lease Agreement states that "[e]ach Schedule shall incorporate by reference all terms and conditions of this Master Lease except as provided herein together with such other terms or amendments, which may be specified in such Schedule, and together with this Master Lease, each Schedule *shall individually constitute the lease . . . for the Equipment specified in such Schedule*." (emphasis added). Master Lease Agreement, § 2. Second, while the schedules of leased equipment cross-reference the "Master Lease," the schedules do not cross reference each other. Third, each of the schedules of leased equipment sought to be rejected through this Motion provides, "[i]n the event of a conflict between any term or condition of the Master Lease and any term of [sic] condition of this lease schedule shall control. The parties intend that this lease schedule *shall constitute a separate and free-standing lease . . .* of the equipment listed below." Accordingly, the "intent of the parties" was for the schedules of leased equipment to be separate contracts.

28.    Moreover, each schedule is for a distinct term and equipment and has distinct rent payment provisions, such that the absence of one of the schedules would not "frustrate" the

purposes of the other schedules.  Here, the Master Lease Agreement functions on a per-schedule basis.  The terms of the Master Lease Agreement and the schedules make clear that the parties intend the total number and identity of equipment under lease to vary, with inclusion on a schedule being effective upon the execution of the schedule by both parties.  Master Lease Agreement, § 2.

29.     Under Section 3 of the Master Lease Agreement, the term of an equipment lease is determined on a per-schedule basis.  *Id*. § 3 ("The term for each Schedule shall commence on the Commencement Date and shall continue for the number of full months set forth in such Schedule.").  Likewise, Section 4 of the Master Lease Agreement provides that payments are calculated on a per-schedule basis.  The Master Lease Agreement itself does not constitute a lease of equipment but instead such equipment is leased through the inclusion on schedules that are subsequently added at different times.  As provided in Section 4 of the Master Lease Agreement, the Debtor pays base rent set forth in each schedule as rental for the equipment leased under each schedule.  Master Lease Agreement, at § 4.

30.     Together, these provisions confirm that the intent of the parties as set forth in the Master Lease Agreement and the schedules was to provide for the flexible leasing of individual equipment varying substantially in number and identity over time.  The Master Lease Agreement merely provides the umbrella terms broadly applicable to each individual lease.  The entry into or the termination of one schedule of leased equipment does not have any impact upon the remaining leased equipment; indeed, throughout the existence of the Master Lease Agreement, the number of pieces of leased equipment has varied to increase as the Debtor's business has scaled and additional equipment was needed.  Moreover, there is no provision in the Master Lease Agreement asserting that the leased assets are to be leased altogether or not at all (*i.e.,* no provision indicating

13

that the parties intended an all-or-nothing lease).  Nor could there be, since the Master Lease
Agreement contemplates variation in the numbers and identity of equipment leased.

31.     The terms of the Master Lease Agreement thus confirm the intuitive conclusion that
the lease of one schedule of equipment under this contract is in no way economically dependent
on the lease of some other schedule of equipment.  The Master Lease Agreement is therefore by
"its terms, nature and purpose . . . susceptible of division and apportionment." *See DB Structured
Prods.*, 402 B.R. at 94.  Accordingly, the Debtor may reject the leases of some equipment
associated with the Master Lease Agreement without rejecting the leases for all equipment and, by
extension, may reject the leases identified in Exhibit 1 to the Proposed Order.

### C.     Rejection Should be Effective as of the Petition Date

32.     Courts routinely approve motions to reject executory contracts or unexpired leases
upon a showing that the debtor's decision to take such action will benefit the debtor's estate and
is an exercise of sound business judgment.  *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984)
(stating that the traditional standard applied by courts to authorize the rejection of an executory
contract is that of "business judgment"); *see also Delightful Music Ltd. v. Taylor (In re Taylor)*,
913 F.2d 102 (3d. Cir. 1990); *In re Buckhead America Corp*., 180 B.R. 83 (Bankr. D. Del. 1995).

33.     Generally, courts have authorized a debtor's rejection of unexpired leases and
executory contracts as of the date of the filing of the applicable rejection motion or the premises
is surrendered, whichever is later.  *See In re Rupari Holding Corp*., 2017 Bankr. LEXIS 4095, at
*14 (Bankr. D. Del. Nov. 28, 2017) ("[B]ankruptcy courts may exercise their equitable powers in
granting [ ] a retroactive [rejection] order when doing so promotes the purposes of Section
365(a)."); *In re Chi-Chi's, Inc*., 305 B.R. 396, 399 (Bankr. D. Del. 2004); *see also In re Fleming
Cos., Inc*., 304 B.R. at 96.  A court may permit such retroactive rejection to avoid unduly exposing

a debtor's estate to unwarranted postpetition administrative or other expenses. *See NLRB v. Bildisco & Bildisco*, 465 U.S. at 521 (stating that rejection relates back to the petition date); *Stonebriar Mall Ltd. P'ship v. CCI Wireless, LLC (In re CCI Wireless, LLC)*, 297 B.R. 133, 140 (D. Col. 2003) (holding that a bankruptcy court "has authority under section 365(d)(3) to set the effective date of rejection at least as early as the filing date of the motion to reject"); *Constant Ltd. P'ship v. Jamesway Corp. (In re Jamesway Corp.)*, 179 B.R. 33, 37-8 (S.D.N.Y. 1995) (affirming bankruptcy court's retroactive approval of lease rejection).

34. The facts in this Chapter 11 Case and the balance of the equities favor the Debtor's rejection of the leases effective as of the Petition Date. Without doing so, the Debtor may incur unnecessary administrative charges for equipment that is not necessary to its business affairs or chapter 11 efforts. The Debtor does not need the leasehold interests created by the leases identified in Exhibit 1 to the Proposed Order to conduct its go-forward businesses and the Debtor no longer derives any meaningful benefit from the equipment to be rejected. On the other hand, requiring the Debtor to continue to perform under the payment obligations of the rejected leases after the Petition Date could impose onerous obligations on the Debtor and its estate. Without the rejection requested herein, the Debtor may incur unnecessary administrative charges that are not necessary to its ongoing business operations.

35. Moreover, CSC will not be unduly prejudiced if the leases are rejected effective as of the Petition Date because, prior to the Petition Date, the Debtor provided CSC with its unequivocal intent to reject certain of the equipment leases, and, in conjunction therewith, indicated that it was unequivocally surrendering possession of the equipment as a result thereof. Further, it is the Debtor's understanding that CSC has removed any equipment that is subject to a lease to be rejected pursuant to this Motion from the properties, including the Premises, where

15

such equipment was located. Additionally, on the Petition Date, or as soon thereafter as practicable, the Debtor has served this Motion on CSC or its agents or representatives by overnight delivery and electronic mail, thereby advising CSC once again that the Debtor intends to reject the schedules of leased equipment immediately effective as of the Petition Date.

36.     In light of the foregoing facts and circumstances, the Debtor respectfully submits that the rejection of the leases identified in Exhibit 1 to the Proposed Order under section 365 of the Bankruptcy Code, effective as of the Petition Date, is a sound exercise of its business judgment, and is necessary, prudent, and in the best interests of the Debtor, its estate, and its creditors. As it is in the Debtor's and its estate's interests to eliminate the potential incurrence of administrative expenses, and to avoid the potential accrual of any further obligations under the equipment leases to be rejected, the Debtor respectfully submits that the retroactive rejection of the equipment leases as of the Petition Date is appropriate. Accordingly, entry of the Proposed Order is warranted.

## RESERVATION OF RIGHTS

37.     Nothing contained herein is intended or shall be construed as (i) an admission as to the validity of any claim against the Debtor; (ii) a waiver of the Debtor's or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtor; (iii) a waiver of any claims or causes of action which may exist against any creditor or interest holder; (iv) an approval, assumption, or adoption, of any agreement, contract, lease, program, or policy between the Debtor and any third party under section 365 of the Bankruptcy Code; or (v) a promise to pay a claim.

## REQUEST FOR IMMEDIATE RELIEF AND WAIVER OF STAY

38.     Pursuant to Bankruptcy Rule 6004(h), the Debtor seeks a waiver of any stay of the effectiveness of an order granting this Motion, to the extent that it applies to the relief requested

in this Motion.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  The relief requested herein is essential to avoid the potential accrual of unnecessary administrative expenses.  Accordingly, the Debtor submits that, to the extent that Bankruptcy Rule 6004(h) applies, ample cause exists to justify a waiver of the fourteen-day stay.

## NOTICE

39.    Notice of the hearing of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the holders of the thirty (30) largest unsecured claims against the Debtor; (iii) CSC; (iv) the Landlord (as defined in the Milford Lease Rejection Motion); (v) counsel to the Prepetition Secured Parties and the DIP Secured Parties; (vi) the Internal Revenue Service; (vii) the United States Attorney's Office for the District of Delaware; (viii) the Securities and Exchange Commission; (ix) the Delaware Secretary of State; (x) the Delaware State Treasury; and (xi) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

40.    No previous request for the relief sought herein has been made by the Debtor to this Court or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court grant the relief requested in this Motion, the Proposed Order, and such other and further relief as is just and proper.

Dated: May 5, 2024                          POTTER ANDERSON & CORROON LLP
Wilmington, Delaware

                                            */s/ Brett M. Haywood*
                                            L. Katherine Good (DE No. 5101)
                                            Brett M. Haywood (DE No. 6166)
                                            Gregory J. Flasser (DE No. 6154)
                                            1313 North Market Street, 6th Floor
                                            Wilmington, Delaware 19801
                                            Tel: (302) 984-6000
                                            Facsimile: (302) 658-1192
                                            Email: kgood@potteranderson.com
                                                    bhaywood@potteranderson.com
                                                    gflasser@potteranderson.com

                                            - and -

                                            GOODWIN PROCTER LLP
                                            Kizzy L. Jarashow (*pro hac vice* admission pending)
                                            Robert J. Lemons (*pro hac vice* admission pending)
                                            James Lathrop (DE No. 6492)
                                            The New York Times Building
                                            620 Eighth Avenue
                                            New York, New York 10018-1405
                                            Tel: (212) 813-8800
                                            Facsimile: (212) 355-3333
                                            Email: kjarashow@goodwinlaw.com
                                                    rlemons@goodwinlaw.com
                                                    jlathrop@goodwinlaw.com

                                            *Proposed Counsel for Debtor and Debtor-in-Possession*

**<u>EXHIBIT A</u>**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
In re:                                             :        Chapter 11
                                                            :
Ambri Inc.,[1]                                 :            Case No. 24-10952 (___)
                                                            :
            Debtor.                            :
                                                            :        **Re: Docket No. ___**
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER REJECTING CERTAIN UNEXPIRED EQUIPMENT
LEASES EFFECTIVE AS OF THE PETITION DATE PURSUANT TO
SECTIONS 105 AND 365(A) OF THE BANKRUPTCY CODE**

Upon the motion (the "Motion")[2] filed by the above-captioned debtor and debtor-in-possession (the "Debtor") seeking entry of an order (this "Order") pursuant to sections 105 and 365 of the Bankruptcy Code rejecting certain leases of leased equipment set forth in Exhibit 1 hereto; and upon the Murphy First Day Declaration and the Chiu First Day Declaration; and upon the statements of counsel in support of the relief requested in the Motion at the hearing, if any, held before the Court; and the record of the hearing, if any, and all of the proceedings had before the Court; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012; and it appearing that venue of the Chapter 11 Case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that it may enter a final order consistent with Article III of the United

---

[1] The Debtor's mailing address is 53 Brigham Street, Unit 8, Marlborough, MA 01752, and the last four digits of the Debtor's federal tax identification number are 0023.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

States Constitution; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors and other parties in interest; and that the legal and factual bases set forth in the Motion establish just cause for the relief granted; and it appearing that proper and adequate notice of the Motion has been given; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      Pursuant to sections 105(a) and 365(a) of the Bankruptcy Code, the leases set forth in Exhibit 1 hereto are rejected, effective as of the Petition Date.

3.      Notwithstanding the relief granted herein and any actions taken hereunder, nothing in the Motion or this Order shall: (i) constitute an admission as to the validity or priority of any claim against the Debtor; (ii) constitute a waiver of the Debtor's rights to dispute any claim; (iii) constitute a determination that the Lease was executory, unexpired, or otherwise not in full force and effect as of the Petition Date; or (iv) prejudice any party's rights to assert that the Lease was or was not executory or unexpired within the meaning of section 365 of the Bankruptcy Code as of the Petition Date.

4.      Notwithstanding any applicability of Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon its entry.

5.      The Debtor is authorized and empowered to execute and deliver such documents and to take and perform all actions necessary to implement and effectuate the relief granted in this Order.

6.      This Court retains jurisdiction with respect to all matters arising from or related to the enforcement of this Order.

2

**EXHIBIT 1**

**(Rejected Equipment Lease by Schedule)**

| Name and Address of Counterparty | Description of Lease |
|---|---|
| CSC Leasing Company, 6806 Paragon Place, Suite 170, Richmond, VA 23230 | Schedule K to Master Lease Agreement, Log No. 2019048K, dated July 1, 2023 |
| CSC Leasing Company, 6806 Paragon Place, Suite 170, Richmond, VA 23230 | Schedule L to Master Lease Agreement, Log No. 2019048L, dated January 1, 2024 |
| CSC Leasing Company, 6806 Paragon Place, Suite 170, Richmond, VA 23230 | Schedule M to Master Lease Agreement, Log No. 2019048M, dated January 1, 2024 |
| CSC Leasing Company, 6806 Paragon Place, Suite 170, Richmond, VA 23230 | Schedule N to Master Lease Agreement, Log No. 2019048N, dated January 1, 2024 |
| CSC Leasing Company, 6806 Paragon Place, Suite 170, Richmond, VA 23230 | Schedule O to Master Lease Agreement, Log No. 2019048O, dated January 1, 2024 |
| CSC Leasing Company, 6806 Paragon Place, Suite 170, Richmond, VA 23230 | Schedule P to Master Lease Agreement, Log No. 2019048P, dated January 1, 2024 |
| CSC Leasing Company, 6806 Paragon Place, Suite 170, Richmond, VA 23230 | Schedule Q to Master Lease Agreement, Log No. 2019048Q, dated November 1, 2022 |
| CSC Leasing Company, 6806 Paragon Place, Suite 170, Richmond, VA 23230 | Schedule R to Master Lease Agreement, Log No. 2019048R, dated November 1, 2022 |
| CSC Leasing Company, 6806 Paragon Place, Suite 170, Richmond, VA 23230 | Schedule S to Master Lease Agreement, Log No. 2019048S, dated November 1, 2022 |
| CSC Leasing Company, 6806 Paragon Place, Suite 170, Richmond, VA 23230 | Schedule T to Master Lease Agreement, Log No. 2019048T, dated November 1, 2022 |
| CSC Leasing Company, 6806 Paragon Place, Suite 170, Richmond, VA 23230 | Schedule U to Master Lease Agreement, Log No. 2019048U, dated November 1, 2022 |