**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Ambri Inc.,[1] | Case No. 24-10952 (LSS) |
| Debtor. | Re: Docket Nos. 14, 15, 148, 181 |

**SUPPLEMENTAL DECLARATION OF STEVEN BREMER IN SUPPORT OF**
**THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS**

I, Steven Bremer, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am a Managing Director at Triple P Securities, LLC, the investment banker to the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"). Triple P Securities, LLC is wholly owned by Portage Point Partners, LLC ("Portage Point"). Triple P RTS, LLC, the Debtor's restructuring advisor is also wholly owned by Portage Point.

2. I submit this Declaration in support of the *Debtor's Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets, (B) Designating the Stalking Horse Bidder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief; and (II)(A) Approving Sale of the Debtor's Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket

---

[1] The Debtor's mailing address is 53 Brigham Street, Unit 8, Marlborough, MA 01752, and the last four digits of the Debtor's federal tax identification number are 0023.

No. 14] (the "Sale Motion")[2] and the *Notice Cancelation of Auction and Designation of Successful Bidder* [Docket No. 181].

3. In addition, this Declaration supplements my two previously filed declarations: (i) the *Declaration of Steven Bremer in Support of Debtor's Motion for Entry of an Order (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets, (B) Designating the Stalking Horse Bidder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling A Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief* (the "Bidding Procedures Declaration") [Docket No. 15]; and (ii) the *Supplemental Declaration of Steven Bremer in Support of Debtor's DIP Motion and Bid Procedures Motion* (the "Supplemental Declaration") [Docket No. 148].

4. Except as otherwise indicated herein, all statements set forth in this Declaration are based upon my personal knowledge, my discussions with members of the Debtor's management team and the Debtor's advisors, my review of relevant documents and information concerning the Debtor's operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.

5. I am authorized to submit this Declaration on behalf of the Debtor and am over the age of 18. If I were called upon to testify, I could and would testify to each of the facts set forth below.

---

[2] Capitalized terms used but not defined herein shall have the meanings set forth in the Sale Motion or the *Order (I) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets, (II) Designating the Stalking Horse Bidder, (III) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (IV) Approving Assumption and Assignment Procedures, (V) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (VI) Granting Related Relief* (the "Bidding Procedures Order") [Docket No. 160], as applicable.

**THE MARKETING PROCESS**

6.  As stated in the Bidding Procedures Declaration and the Supplemental Declaration, the Debtor engaged Portage Point in March 2024, to provide various restructuring advisory and investment banking services. Since commencing its engagement, Portage Point has provided assistance in numerous areas including in connection with the Debtor's sale process.

7.  Specifically, with respect to the Debtor's sale process, in the period leading up to the Petition Date, Portage Point commenced a prepetition marketing process and prepared for a robust postpetition sale process to align with the milestones provided in the DIP Term Facility.

8.  In the months leading to the Petition Date, Portage Point engaged in extensive dialogue with the Debtor's senior management, reviewed the Debtor's operations and assets, and developed a plan for a value-maximizing sale process. To that end, Portage Point worked with the Debtor to develop a set of marketing materials intended for distribution to prospective buyers of the Debtor's Assets, which included a teaser, confidential information memorandum, and the aggregation of key company documents located in an online data room for further diligence. In addition, Portage Point worked with the Debtor to develop a broad list of suitable potential buyers.

9.  Beginning on April 24, 2024, and continuing thereafter, Portage Point began outreach to a broad universe of relevant strategic and financial parties to assess interest in an acquisition of all, or substantially all, of the Debtor's assets.

10. In total, Portage Point reached out to approximately 125 parties and offered them the opportunity to participate in the sale process. Prior to the Petition Date, no third-party made an actionable proposal to the Debtor.

11. Faced with no actionable sale proposal in advance of the Petition Date, a new entity formed by the Prepetition Secured Noteholders (the "Stalking Horse Bidder") agreed to (a) serve

as the stalking horse bidder pursuant to the terms of that certain asset purchase agreement, attached to the Bidding Procedures as Exhibit A, (the "Stalking Horse APA"), the form of which has been agreed to by the Debtor and the Stalking Horse Bidder; (b) acquire substantially all of the Debtor's Assets as a going concern; (c) expose the Stalking Horse APA to higher and/or better offers through a chapter 11 process; and (d) support the process by agreeing to provide necessary debtor-in-possession financing to the Debtor. Upon information and belief, the Stalking Horse APA was the result of arms-length, good-faith negotiations between the Debtor and the Stalking Horse Bidder.

12. After the Petition Date and the Debtor's entry in the Stalking Horse APA, Portage Point and the Debtor continued efforts to market the Assets through June 21, 2024, the bid deadline established pursuant to the Bidding Procedures Order (the "Bid Deadline"). Specifically, Portage Point contacted all third-parties that were previously contacted as part of the prepetition sale process to inform them of the Debtor's Chapter 11 Case, the Stalking Horse APA and the Bidding Procedures, and to gauge their interest in participating in the sale process. In addition, Portage Point was in contact with five additional parties to gauge their interest in acquiring all, or substantially all, of the Debtor's assets. As a result of this outreach, four potential bidders executed confidentiality agreements ("NDAs") and received access to the confidential materials provided by the Debtor. On June 17, 2024, all parties who had signed NDAs and were actively engaged in the diligence and sale process were informed by Portage Point that the initial Stalking Horse Bid had been reduced to $9.5 million as set forth in that certain *Settlement Term Sheet* [Docket No. 156].

13. Throughout the marketing and sale process, Portage Point and the Debtor, together with the Debtor's other advisors and management team, were committed to obtaining higher and

otherwise better offers for the Assets and achieving a successful sale for the benefit of the Debtor's stakeholders.

### **THE STALKING HORSE APA REPRESENTS THE HIGHEST AND BEST VALUE**

14.   Despite the Debtor's marketing efforts, none of the parties contacted during the postpetition sale process submitted an indication of interest with respect to a sale of the Assets, and the Debtor received no bids from such parties by the Bid Deadline. Further, no party requested additional time or indicated that they may consider submitting a bid if they had additional time. Accordingly, the Debtor, after consultation with Portage Point and the Debtor's other advisors, canceled the Auction [Docket No. 181] and determined, in their business judgment, that the Stalking Horse Bid and the Stalking Horse APA represent the highest and otherwise best bid for the sale of the Assets. *See Notice Cancelation of Auction and Designation of Successful Bidder* [Docket No. 181].

15.   Based on the Debtor's marketing efforts described above, along with my experience as a restructuring professional, I believe that the terms of the Stalking Horse APA represent the highest and best value for the Assets. A market test, such as the extensive one conducted by Portage Point, is the best means to identify the value of the Assets. Here, as proven by the Debtor's thorough marketing and sale process during this Chapter 11 Case, the Stalking Horse Bid represents the highest and best value for the Assets given the circumstances of this Chapter 11 Case.

16.   Accordingly, I believe that the Stalking Horse APA represents a fair and reasonable offer to purchase the Assets given the circumstances of this Chapter 11 Case and on the basis of the process conducted. No other person, entity, or group of entities has offered to purchase the Assets for greater overall value to the Debtor's estate than the Stalking Horse Bidder.

17.     I believe that (i) the Debtor conducted a thorough marketing process for the Assets and (ii) the Debtor and its professional advisors afforded all potential purchasers an appropriate opportunity to participate in the sale process and submit a bid for the Assets.

18.     The Bidding Procedures were non-collusive, substantively and procedurally fair to parties, and obtained the highest overall value for the Debtor's Assets, its creditors, and its estate, given the circumstances of this Chapter 11 Case, and I believe that the Debtor complied with the Bidding Procedures approved by the Court. There has been no showing to my knowledge of any self-dealing or manipulation of any kind in the negotiation of the Stalking Horse APA, and it is my understanding that the Debtor is not aware of any. To the best of my knowledge, the Debtor and the Stalking Horse Bidder have acted at all times in good faith in connection with the marketing and sale process, and, among other things: (a) the Debtor was free to deal with any other party interested in acquiring the Assets; (b) the Stalking Horse Bidder was subject to, and complied with, the Bidding Procedures and Bidding Procedures Order; (c) the Stalking Horse APA was negotiated, proposed, and entered into by the Debtor and the Stalking Horse Bidder without collusion, in good faith, and from arm's length bargaining positions; (d) there has been no improper influence or conduct by the Stalking Horse Bidder in connection with the negotiation of the Stalking Horse APA and related documents with the Debtor; and (e) neither the Debtor nor the Stalking Horse Bidder has engaged in any conduct that would cause or permit the avoidance of the Sale, the Stalking Horse APA, or the imposition of costs or damages under section 363(n) of the Bankruptcy Code.

19.     Based on my professional experience and knowledge of the Chapter 11 Case, I believe that (i) the Debtor's sale process was robust, fair, and consistent with sale processes in

other similar chapter 11 cases and (ii) the Stalking Horse APA represents fair and reasonable terms for the purchase of the Assets based on the Debtor's marketing process described herein.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 3, 2024
New York, New York

By:    /s/ Steven W. Bremer
Name:  Steven W. Bremer
Title: Managing Director, Triple P Securities, LLC

11584563v.3